

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-24-00256-CR

_____

STEVE COLE BRASHEAR, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 4
Tarrant County, Texas
Trial Court No. 1832305

---

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

Appellant Steve Cole Brashear appeals his conviction for aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 21.02(a)(2). In two points, Brashear contends (1) that the evidence is insufficient to support the jury's guilty verdict because the State "failed to disprove" his claim of self-defense beyond a reasonable doubt and (2) that the trial court abused its discretion by overruling his Rule 403 objection to the admission of certain evidence without conducting a balancing test. We will affirm.

## I. BACKGROUND

Janice Payton,[1] the complainant, testified that on March 23, 2020—near the beginning of the COVID pandemic—she received some food from a local food pantry and decided to share it with Brashear, whom she had known for several months and considered a friend. Payton had planned to just leave the food on his porch, but Brashear insisted that she come into the house, and she acquiesced.

As Payton sat in Brashear's living room and talked to him, she could tell that he was in a bad mood. She testified that Brashear became aggravated when she petted his dog and that he complained that she had probably given the dog COVID. When Payton explained that she could not have infected the dog because she had removed

---

[1]At points in the record, Payton is referred to as Janice Payton Sanchez. During her direct testimony, she explained that Sanchez had been her married name but that she had divorced before trial.

her gloves and had used antibacterial spray on her hands, Brashear accused her of lying and told her that he hated liars. He then told her that she could not leave because if he ended up catching COVID from his dog, he wanted to know where she was. Brashear became even more upset after his dog refused to come to him when called and instead went to Payton.

According to Payton, both she and Brashear stood up, and then Brashear punched her in the nose. Payton was stunned by the blow and found herself locked inside the house with no way to leave. Brashear proceeded to hit Payton in the nose a second time before going to his bedroom to retrieve a cattle prod. After repeatedly shocking Payton with the cattle prod, Brashear picked up a baseball bat and began hitting her in the head, ribs, arms, and legs. Payton attempted to kick Brashear away, but he continued to hit her with the bat and with the cattle prod. Because of her intense pain and fear, Payton lost control of her bladder and her bowels.

Payton recalled that Brashear had then threatened to "shoot [her] knees off" and to "feed pieces of [her] to coyotes" but had suddenly stopped talking when he heard the police knocking on the front door. Brashear asked Payton to lie to the police about what had happened, but she refused.

According to Payton, Brashear then dragged her by her hair and her collar from the living room to a back corner of the kitchen where he wedged her between the refrigerator and a large trash can. Because of her injuries, she could not get up.

3

While she was lying on the kitchen floor, Payton saw Brashear go into a closet and overheard him talking to Isaac "Angel" Cruz, who had begun living in Brashear's home about two weeks before the assault.[2] Cruz had been sleeping on the floor of a closet off of the kitchen when Brashear suddenly woke her up. According to Cruz, Brashear appeared frantic, claimed that he was "going to get in trouble," and told Cruz "to go out there" with him and tell the police that Cruz and Brashear had been arguing. Cruz saw Brashear hide the baseball bat after rinsing blood off it and place the cattle prod on top of the washer or the dryer after wrapping it in a towel. While he was hiding the weapons, Brashear kept pleading with Cruz to lie to the police for him. But Cruz adamantly refused.

After his efforts to get Cruz to lie for him failed, Brashear once again grabbed Payton by her hair and her collar and dragged her across the house—this time to the bathroom. Payton testified that Brashear got into the shower and rinsed her blood off his clothes and then placed her in the shower. Although Brashear eventually left the bathroom, Payton was unable to leave because of her injuries and ended up falling into the corner of the tub.

---

[2]Cruz had been a participant in a program run by My Health My Resources of Tarrant County (MHMR) for individuals with mental-health challenges. Because of the COVID pandemic, Cruz had to leave the housing provided by MHMR and find a new place to stay on short notice. A friend suggested that Cruz might be able to live with Brashear. After Cruz's MHMR case manager met with Cruz and Brashear, arrangements were made for Cruz to live at Brashear's home.

While Brashear was dragging Payton to the bathroom, the police were pounding on the front door and instructing him to come outside. After seeing Brashear go outside to talk to the police, Cruz ran to the bathroom to help Payton, who was "[b]eat up, bloodied" and appeared to be dead. Realizing that Payton was alive after she let out a moan, Cruz picked her up and carried her to the police.

The police had been called by Demyia Pridgen, Cruz's MHMR case manager, who had gone to Brashear's house to check on Cruz. Pridgen testified that when she approached Brashear's front door, she heard screaming and yelling and that it sounded like "someone was being beaten to a pulp." Based on her familiarity with Cruz's voice, Pridgen did not believe that Cruz was the one doing the beating or the one being beaten. After consulting with her supervisor, Pridgen called 911.

When the police arrived, they heard arguing and discerned a man's voice calling someone "a bitch." The police knocked on the front door and announced themselves and repeatedly yelled that they were not leaving until someone answered. After a lengthy delay, Brashear answered the door. When asked what was going on, Brashear told the police that he and his girlfriend were arguing. When an officer told Brashear that his girlfriend needed to come outside so that he could talk to her, Brashear stated that she needed to put on some clothes and then went back inside the house.

After more time passed with no one coming out of the house, the officer knocked again and yelled for Brashear, who finally came to the front door again. He claimed that his girlfriend was still dressing. The officer then instructed him to come

5

outside. When the officer asked about the raised voices that he had heard, Brashear told him that "nothing [was] really going on" and that his girlfriend was just upset. The officer observed that Brashear appeared nervous, was being evasive, and did not want the police to go inside his house.

When the police saw Payton, who was obviously injured, coming out of the bathroom with Cruz's assistance and asked what had happened to her, Brashear responded that "she came like that already." After the police assured Payton that Brashear had been restrained and removed from the premises, she told them what had happened.

Payton was examined and treated by emergency medical technicians and then taken to the hospital. The emergency-room physician who treated her testified that she had multiple blunt-force-trauma injuries, including nasal bone fractures, a right scapular fracture, multiple rib fractures, a right-hand fracture, and a left-kneecap fracture. She also had a laceration on the right side of her scalp and bruises all over her body. And her blood work showed that she may have suffered an injury to her kidney.

Brashear testified at trial and offered a radically different version of events. Although he acknowledged that he had struck Payton with a baseball bat, he claimed that he had done so in self-defense to prevent Payton from stealing from him and shocking him with a cattle prod. He testified that he had been asleep when Payton unexpectedly knocked on his door. He said that she "looked like hell" and that he

6

had invited her in for coffee. According to Brashear, Payton told him that "a guy" to whom she owed money had beaten her up and that "she needed to get money . . . like right then." Brashear responded that he did not have any money and then asked her to leave because he was going back to bed. Assuming that Payton had left, Brashear went back to his room and fell asleep.

Brashear testified that he was awakened by someone who was squatting down beside his bed going through his drawers. He could not tell who the person was because the room was dark and the person was wearing a dark coat and skull cap, but he believed that it was a man trying to steal from him. Brashear claimed that the man had Brashear's cattle prod, had activated it, and was pointing it at him. Brashear alleged that he had grabbed the baseball bat that had been sitting beside his bed and had begun "whaling" on the intruder. According to his testimony, he hit the intruder five times and successfully knocked the cattle prod out his hand; the intruder then held up his hands and ran into the living room. Brashear said that he only discovered that the intruder was Payton after following her into the living room.

According to Brashear, when the police arrived, Payton asked him to lie about what had happened because she was afraid of going to jail. He claimed that he agreed to do so because he still considered Payton a friend even though she had tried to steal from him. He explained that he had lied to the police and had asked Cruz to lie to the police to protect Payton.

After considering all the evidence, the jury—implicitly rejecting Brashear's self-defense claim—found him guilty of aggravated assault with a deadly weapon and assessed his punishment at seventy-five years in prison.[3] The trial court sentenced him accordingly. This appeal followed.

## II. DISCUSSION

### A. SUFFICIENCY OF THE EVIDENCE

In his first point, Brashear contends that the evidence is legally insufficient to support his conviction. Specifically, he contends that the State "failed to disprove" his claim of self-defense beyond a reasonable doubt. We disagree.

#### 1. Standard of Review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). This standard gives full play to the factfinder's responsibility to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021).

---

[3]The indictment contained a habitual-offender paragraph, and the jury found this paragraph to be true.

8

The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

A defendant has the burden of producing some evidence to support a claim of self-defense. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). After the defendant has introduced some evidence of a defense, the State bears the burden of persuasion to disprove it. *Braughton*, 569 S.W.3d at 608; *see Zuliani*, 97 S.W.3d at 594 & n.5. The State's burden does not require it to introduce evidence disproving the defense; rather, it requires the State to prove its case beyond a reasonable doubt. *Braughton*, 569 S.W.3d at 608. To determine the legal sufficiency of the evidence to disprove self-defense, we ask whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential

elements of the charged offense beyond a reasonable doubt and also could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App.1991); *Dotson v. State*, 146 S.W.3d 285, 291 (Tex. App.—Fort Worth 2004, pet. ref'd).

### 2. Analysis

The evidence is legally sufficient to support Brashear's aggravated-assault-with-a-deadly-weapon conviction despite his claim of self-defense.

A person commits aggravated assault with a deadly weapon if he intentionally, knowingly, or recklessly causes bodily injury to another and uses or exhibits a deadly weapon during the commission of the assault. Tex. Penal Code Ann. §§ 22.01(a), 22.02(a)(2). In the instant case, the indictment alleged that Brashear intentionally or knowingly caused Payton bodily injury by striking her with a bat or his hand or by contacting her with a cattle prod. Brashear admitted at trial that he had intentionally caused Payton bodily injury by striking her with a baseball bat.[4] Nevertheless, he contends that he should not have been convicted because he reasonably believed that the use of such force was immediately necessary to protect himself and his property

---

[4]The State presented evidence that the baseball bat qualified as a deadly weapon. *Cf. Rench v. State*, No. 02-23-00143-CR, 2024 WL 482232, at *2–3 (Tex. App.—Fort Worth Feb. 8, 2024, no pet.) (mem. op., not designated for publication) (concluding that evidence was sufficient to support jury's determination that appellant had used a baseball bat as a deadly weapon). And, as detailed above, Payton testified that Brashear had also struck her with his hand and had contacted her with a cattle prod.

and the State failed to meet its burden of persuasion to disprove his self-defense claim. *See* Tex. Penal Code Ann. § 9.31(a); *see also Braughton*, 569 S.W.3d at 608. But the record does not support this contention.

Although Brashear testified that he had acted in self-defense, the jury, as the sole judge of the evidence's weight and credibility, was free to reject this testimony. *See Thomas v. State*, No. 02-15-00216-CR, 2016 WL 3889146, at *2 (Tex. App.—Fort Worth July 14, 2016, no pet.) (mem. op., not designated for publication) (first citing *Murray v. State*, 457 S.W.3d 446, 448–49 (Tex. Crim. App. 2015); and then citing *Hernandez v. State*, 161 S.W.3d 491, 500 & n.28 (Tex. Crim. App. 2005)). And given the other evidence in the record, including Cruz's testimony that Brashear had dragged Payton to the bathroom, had rinsed blood off the baseball bat, and had asked Cruz to lie to the police to keep him—not Payton—out of trouble, the jury simply may have believed Payton's version of events and rejected Brashear's. *See Smith v. State*, 352 S.W.3d 55, 63 (Tex. App.—Fort Worth 2011, no pet.); *see also Denman v. State*, 193 S.W.3d 129, 132 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (rejecting appellant's sufficiency argument even though the appellant had called six witnesses who testified that the complainant—who did not testify at trial—had previously assaulted or threatened appellant with weapons because the jury was free "to believe all, some, or none of the testimony presented by the parties" and had "implicitly rejected [appellant's] self-defense theory" and the testimony supporting it by finding appellant guilty of aggravated assault). Indeed, in our sufficiency review, we must

11

presume that the jury resolved all evidentiary conflicts in favor of the prosecution and defer to that resolution. *Smith*, 352 S.W.3d at 63.

After viewing all the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found the essential elements of aggravated assault with a deadly weapon beyond a reasonable doubt and also could have found against Brashear on the self-defense issue beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914; *Dotson*, 146 S.W.3d at 291.

Accordingly, we overrule Brashear's first point.

## B. RULE 403 OBJECTION

In his second point, Brashear contends that the trial court abused its discretion by admitting certain evidence over his Rule 403 objection without conducting the requisite balancing test. We disagree.

### 1. Standard of Review and Applicable Law

We review a trial court's decision to admit or exclude evidence under an abuse-of-discretion standard. *Zuliani*, 97 S.W.3d at 595; *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (op. on reh'g). We will not reverse a trial court's decision to admit or exclude evidence unless the record shows a clear abuse of discretion. *Zuliani*, 97 S.W.3d at 595. An abuse of discretion occurs only when the trial court's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Id.* If the trial court's evidentiary ruling is correct on any applicable theory of law, we will not disturb it even if the trial court gave the wrong

12

reason for its correct ruling. *De la Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009); *Qualls v. State*, 547 S.W.3d 663, 675 (Tex. App.—Fort Worth 2018, pet. ref'd).

Rule 403 provides that the trial court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. Tex. R. Evid. 403. "Rule 403 favors the admission of relevant evidence and carries a presumption that relevant evidence is more probative than prejudicial." *James v. State*, 623 S.W.3d 533, 546–47 (Tex. App.—Fort Worth 2021, no pet.) (first citing *Montgomery*, 810 S.W.2d at 389; and then citing *Emich v. State*, No. 02-18-00059-CR, 2019 WL 311153, at *7 (Tex. App.—Fort Worth Jan. 24, 2019, pet. ref'd) (mem. op., not designated for publication)). Because of this presumption, it is the burden of the party opposing the admission of the evidence to show that the evidence's probative value is substantially outweighed by one or more of the dangers listed in Rule 403. *James*, 623 S.W.3d at 547.

To determine whether evidence is admissible in the face of a Rule 403 objection, the trial court must conduct a balancing test. *Montgomery*, 810 S.W.2d at 389; *see Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). The Texas Court of Criminal Appeals has instructed that when undertaking a Rule 403 analysis, courts must balance (1) the inherent probative force of the proffered item of evidence and (2) the proponent's need for that evidence against (3) any tendency of

13

the evidence to suggest a decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency that a jury that has not been equipped to evaluate the probative force of the evidence would give it undue weight, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco*, 210 S.W.3d at 641–42.

### 2. Relevant Background

At the beginning of the trial's second day, the trial court held an off-the-record hearing regarding the admission of evidence regarding, among other things, Brashear's 1986 conviction for assault with a deadly weapon. Following the hearing, the trial court announced on the record that it had decided to exclude the evidence of this offense subject to reconsideration "should the probative value become higher based on the balance of the evidence admitted in front of the jury." Prior to the State's cross-examination of Brashear, the prosecutor asked the trial court to reconsider its ruling regarding the 1986 conviction based on Brashear's answers during his counsel's direct examination. Brashear objected based on "relevance and improper character and 403." The trial court overruled Brashear's objections and ruled that the State could question Brashear about the 1986 conviction. But following a recess for lunch, the trial court gave Brashear's counsel the opportunity to argue that it should reconsider its ruling. After the recess, Brashear's counsel again objected based on "relevance, 403, [and] improper character evidence." After hearing additional

14

argument, the trial court issued a final ruling overruling Brashear's Rule 403 objection without explicitly stating any balancing-test findings or conclusions.[5]

### 3. Analysis

Brashear argues that the trial court erred by overruling his Rule 403 objection to the evidence concerning his 1986 conviction. But Brashear's general Rule 403 objection did not identify for the trial court which of the five distinct evidentiary-exclusion grounds in Rule 403 precluded the admission of the complained-of evidence. Thus, his objection was insufficient to preserve his complaint for review. *See* Tex. R. App. P. 33.1(a)(1); *Andrews v. State*, No. 02-17-00052-CR, 2018 WL 3385661 at *4 (Tex. App.—Fort Worth July 12, 2018, pet. ref'd) (mem. op., not designated for publication); *Checo v. State*, 402 S.W.3d 440, 451 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd); *see also Warren v. State*, No. 02-17-00221-CR, 2018 WL 3764069, at *6 (Tex. App.—Fort Worth Aug. 9, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that appellant had forfeited complaint regarding trial court's failure to conduct a Rule 403 balancing test by failing to raise this specific complaint at trial).

Further, even if Brashear had preserved his complaint, we would overrule it on the merits. As noted, once a Rule 403 objection is invoked, the trial judge must engage in the balancing test required by that rule. *Gigliobianco*, 210 S.W.3d at 641–42;

---

[5]The trial court also overruled Brashear's other objections, but he does not challenge these rulings on appeal.

15

*Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997).  But a trial court is not required to sua sponte place into the record any findings it makes or conclusions it draws when engaging in this test, *Williams*, 958 S.W.2d at 195, and Brashear did not ask the trial court to make any such findings or conclusions on the record.  Under these circumstances, the trial court is presumed to have engaged in the required balancing test.  *Id.* at 195–96; *Reyes v. State*, 480 S.W.3d 70, 77 (Tex. App.—Fort Worth 2016, pet. ref'd).

We overrule Brashear's second point.

### III.  CONCLUSION

Having overruled both of Brashear's points, we affirm the trial court's judgment.

/s/ Brian Walker

Brian Walker
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  August 26, 2025